UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY L. SMITH, PERSONAL
REPRESENTATIVE OF THE ESTATE OF                    Case No. 05-71194
ROSE MARY WASHAM, DECEASED,
                                                   Honorable Nancy G. Edmunds
          Plaintiff,

v.

AuSABLE VALLEY COMMUNITY MENTAL
HEALTH SERVICES,

          Defendant.
_____/


**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
DISMISS OR FOR SUMMARY JUDGMENT [33]**


At a hearing held on May 10, 2006, this matter came before the Court on Defendant

Au Sable Valley Community Mental Health Services ("AVCMHS")'s motion for dismissal

and/or summary judgment, brought pursuant to Rules 12(b)(1), 12(b)(6), and 56(c) of the

Federal Rules of Civil Procedure.  Plaintiff Mary L. Smith, personal representative of the

estate of Rose Mary Washam, deceased, filed this action against Defendants Au Sable

Valley Community Mental Health Services, Judith Ann Muller (formerly Schomaker,

hereinafter "Judy Muller"), and Emerson Electric. Co. on March 28, 2005.  On April 15,

2005, this Court declined to exercise supplemental jurisdiction over Plaintiff's state-law

claims.  Thus, the sole remaining claim before this Court is Plaintiff's claim brought under

42 U.S.C. § 1983, alleging a substantive due process violation.  For the reasons discussed

below, Defendant's motion is GRANTED IN PART AND DENIED IN PART.

## I.    Facts

Au Sable Valley Community Health Services ("AVCMHS") is a governmental entity that operates a residential community mental health program which provides services to emotionally disturbed and developmentally disabled individuals.  AVCMHS operates several adult foster care homes which are funded, in principal part, by the Medicaid program. (Pl.'s Compl. ¶ 9.)

AVCMHS operates the River Bend Adult Foster Care (AFC), a six bed adult foster care home, located at 4501 East F-41, Oscoda, Michigan.  (*Id.* at ¶ 11.)

Plaintiff's decedent, Rose Mary Washam, was a 58-year old client of AVCMHS from 1987 until her death on January 7, 2003.  (Pl.'s Compl. ¶12.) She came to AVCMHS from an institutional setting and resided in another AVCMHS group home before arriving at River Bend in the early 1990's.  (*Id.*)

Due to her profound retardation, seizure disorder, and major depression, AVCMHS had determined that Washam required "physical assistance in all areas of self care."  (*Id.* at ¶ 13.)  AVCMHS' Person-Centered Plan regarding Washam, dated October 3, 2002, provides that she was never married, has no family history, and comes from an institutional setting."  (Pl.'s Ex. 3 at ¶ 6.)  It states that she "requires physical assistance in all areas of self-care. . . .", is "often unwilling to participate. . . . [and] also has significant health and safety concerns that require direct supervision and assistance."  (*Id.* at ¶ 5.)  It describes Ms. Washam as "nonverbal but . . . able to communicate with those individuals that are familiar with her through her gestures and also, at times, with self abusive responses. Rose will also use guttural sounds that usually indicate a negative response to a situation."

(*Id.* at ¶ 9.)  It also expressly states that "Rose Mary requires direct supervision with bathing."  (Pl.'s Ex. 3 at ¶18.)

On January 7, 2003, Judy Muller, an AVCMHS employee at River Bend, gave Washam a shower.  Muller was the shift leader that day.  (Pl.'s Ex. 5, Bricker Dep. at 32.) Muller testified at her deposition that prior to showering Washam she had warned another employee "to be careful with the water . . . [because] it feels warmer than usual."  (Pl.'s Ex. 4, Muller Dep. at 90.)  She was warning the other employee "[s]o she wouldn't get burned or burn someone else. . . ."  (*Id.*, Muller Dep. at 92.)  She realized that the water was hot enough to burn someone.  (Muller Dep. at 93.)

The other employee, Nancy Bricker, testified that while preparing breakfast at about 8:45 a.m. on January 7, 2003, she discovered that the water in the house was exceptionally hot, advised Muller, who was in the kitchen with her using a washcloth to wipe off a client's face that the water was "exceptionally hot", and Muller replied that she "thought it was hot also." (Bricker Dep. at 33-34.)   Bricker further testified that the water was getting increasingly hotter.   (Bricker Dep. at 35.)   At approximately 9:15 a.m., after this conversation took place, Muller left the room to give Rose Washam a shower.  (*Id.*)

Plaintiff alleges that due to a mechanical failure, the hot water at River Bend reached 176 degrees that day.  (Pl.'s Compl. ¶ 21.)  Plaintiff further alleges that, because of her mental and physical limitations, Rose Mary Washam was at high risk for scalding from the exceptionally hot water due to her complete dependency on the staff for her care, her inability to speak, and her lack of safety awareness.  (*Id.* at ¶ 14.)

During her shower, Rose Mary Washam suffered extensive second and third degree burns over more than 70% of her body from exposure to hot water.  (Pl.'s Ex. 6, Autopsy

3

Report at 3.)  Ms. Washam died at Hurley Medical Center on February 3, 2003, as a result of complications from her burns.  (*Id.*)

Muller's manner of showering Washam is in dispute. (Def.'s Resp. 2; Pl.'s Mot. at 6). Defendant argues (without evidentiary support) that Muller checked the water temperature prior to rinsing Washam, but the boiler's mechanical failure caused the hot water to rapidly increase in temperature.  (Def.'s Resp. at 2.)  Based on his review of the medical records, depositions, and other documentary evidence related to this case, Plaintiff's long-term care expert, Lance Youles, disputes this version of events.  He opines that Muller was not adequately supervising or showering Washam at all times during the shower, and attributes Washam's death to AVCMHS's negligent failure to provide Washam with a safe environment.  (Pl.'s Ex. 8, Youles Aff. ¶ 23.g., ¶ 25.)

In his affidavit, Mr. Youles recounts that, during Ms. Washam's shower, Ms. Bricker and another resident heard Ms. Washam making loud noises.  Ms. Washam was heard crying after the shower.  (*Id.* at ¶ 17.)  In her January 7, 2003 statement, Ms. Bricker indicated that the shower took place at 9:15 a.m. and she was surprised when the water was turned off at 9:20 a.m., and she noted that Rose hollered a lot, which was her way of voicing discomfort/displeasure.  Ms. Bricker then recalled Judy Muller coming out to the kitchen, getting the phone, and going back into the bathroom where Ms. Washam was located.  Shortly after that, Judy Muller came back out to the kitchen and mentioned that she burned Rose Washam, that she didn't know what to do, and that she had called the nurse.  (*Id.*)

Ms. Muller's January 8, 2003 statement indicates that, after the shower, she helped Rose Washam out of the shower, that Ms. Washam was crying and her skin was pink.  Ms.

4

Muller did not see that her skin was peeling until she started to dry her off.  She realized

then that Rose Washam had been burnt by the water and called the nurse right away.  (*Id.*)

The AVCMHS nurse arrived at River Bend within about 3 minutes after being called.

In her deposition, she testified that Rose Washam was crying and slapping the side of her

face, that she had several layers of skin peeled back on her face toward her ears, that her

shoulders were pure white, and her legs were red and had skin peeled off.  Judy Muller told

the nurse that she had treated Ms. Washam's face with "Neosporin" after the shower.  The

nurse told the River Bend staff to get an ambulance.  The ambulance arrived within 5 to 7

minutes.  (*Id.*)

Rose Washam was transported to St. Joseph Hospital in Tawas for treatment.  Shortly

after her admission, she was transferred to Hurley Medical Center in Flint, Michigan.  She

died at Hurley Medical Center on February 3, 2003.  (*Id.* at ¶¶18-19.)

## II.   Standard of Review

### A.  Motion to Dismiss

A Rule 12 (b) (6) motion to dismiss tests the sufficiency of a complaint.  In a light most

favorable to the plaintiff, the court must assume that the plaintiff's factual allegations are

true and determine whether the complaint states a valid claim for relief. *See Albright v.*

*Oliver*, 510 U.S. 266 (1994); *Bower v. Federal Express Corp.*, 96 F.3d 200, 203 (6th Cir.

1996); *Forest v. United States Postal Serv.*, 97 F.3d 137, 139 (6th Cir. 1996).

This standard of review "'requires more than the bare assertion of legal conclusions.'"

*In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) (quoting *Columbia*

*Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)). The complaint must

include direct or indirect allegations "respecting all the material elements to sustain a

5

recovery under *some* viable legal theory." *See In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citations omitted). A court should not grant a 12(b)(6) motion unless the movant shows "beyond doubt that the plaintiff can prove no set of facts in support of his claim." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  The Court's function "is not to weigh the evidence or assess the credibility of witnesses but rather to examine the complaint and determine whether the plaintiff has pleaded a cognizable claim."  *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 452 (6th Cir. 2003) (internal citations omitted).

### B. Motion for Summary Judgment

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Id.* at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The non-moving party may not rest upon its mere allegations, however, but rather "must set

6

forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which a jury could reasonably find for the non-moving party. *Hopson v. Daimler Chrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis

### A.   Rule 12(b)(1) Dismissal

Defendant argued in its brief that there is no basis for federal jurisdiction because Plaintiff's allegations pose no federal question and thus Plaintiff's complaint should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. (Def. Br. at 5.) At the hearing, however, Defendant conceded that, on its face, Plaintiff's complaint alleges a federal claim; i.e., one brought pursuant to 42 U.S.C. § 1983.

### B.   Rule 12(b)(6) Dismissal

### 1.   Private Rights Created by Federal Statutes

Section 1983 establishes a federal cause of action against anyone who acts under the color of state law to deprive a person of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 serves to protect both rights secured by the Constitution and rights secured by federal statutes. *Maine v. Thiboutot*, 448 U.S. 1, 4-6 (1980). However, to utilize § 1983, "a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)).

7

Plaintiff argues that three federal statutes create individual rights enforceable under § 1983: 42 U.S.C. 15009(3)(B)(i), 42 U.S.C. § 9501(1)(G), and 42 U.S.C. § 10841.   The Supreme Court has recently established clear requirements for analyzing whether a federal statute creates a private right enforceable under § 1983.  *See Gonzaga.  See also Johnson v. City of Detroit*, No. 04-1817, ___ F.3d ___, 2006 WL 1153762 (6th Cir. May 3, 2006) (applying *Gonzaga* and holding that the Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. §§ 4821-46, the United States Housing Act of 1937, as amended, 42 U.S.C. §§ 1437-1437bbb, and administrative regulations promulgated under those statutes do not create individual federal rights enforceable under 42 U.S.C. § 1983.)

It is the Court's responsibility to "determine whether Congress intended to create a federal right." *Id.* at 283.  If the text and structure of a statute do not provide any "indication that Congress intends to create new individual rights, there is no basis for a private suit . . . under § 1983." *Id.* at 286.   Moreover, Congress must use "clear and unambiguous terms" to create individual rights.  *Id.* at 290.

 "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.'" *Id.* at 284 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 692 (1979)).   Title VI of the Civil Rights Act of 1964, for example, uses the language "[n]o person in the United States shall, on the ground of race, color, or national origin, be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  The Court held in *Cannon* that this statute was phrased "with an unmistakable focus on the benefitted class" and thus creates individual rights. *Cannon,* 441 U.S. at 691.  In contrast, federal funding statutes that focus their language on either the federal official directed at disbursing the funds or the entity regulated by the

8

statute, do not demonstrate congressional intent to create individual rights. *Gonzaga*, 536 U.S. at 288.

In addition to using "rights-creating" language, "the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms" to confer an enforceable right. *Id.* at 282 (quoting *Blessing,* 520 U.S. at 340-41). Thus, references to "rights" in statutes do not necessarily create federal rights enforceable under § 1983. *Gonzaga,* 536 U.S. at 289, n.7.

Contrary to Plaintiff's arguments here, the three federal statutes she relies upon do not create individual federal rights enforceable under 42 U.S.C. § 1983.

### a.  42 U.S.C. § 15009(3)(B)(i)

Application of the Supreme Court's analysis in *Pennhurst* leads this Court to reject Plaintiff's argument that an individual federal right is created under 42 U.S.C. § 15009(3)(B)(i). In *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981), the Court held that the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. § 6000 et seq., did not grant federal rights to the developmentally disabled. *Id.* at 31. Although the "bill of rights" provision, 42 U.S.C. § 6010, used language that appeared to be rights-creating,[1] the Court held that language did not create mandatory obligations on the state receiving funds under the statute but instead communicated congressional preferences:

---

[1]"Congress makes the following findings respecting the rights of persons with developmental disabilities: . . .
(3) The Federal Government and the States both have an obligation to assure that public funds are not provided to any [institution] . . . that . . . (B) does not meet the following minimum standards." *Pennhurst*, 451 U.S. at 13 (quoting 42 U.S.C. § 6010).

9

Respondents nonetheless insist that the fact that § 6010 speaks in terms of "rights" supports their view [that § 6010 creates rights]. Their reliance is misplaced. . . . Contrary to respondents' assertion, the specific language and the legislative history of § 6010 are ambiguous. We are persuaded that § 6010, when read in the context of other more specific provisions of the Act, does no more than express a congressional preference for certain kinds of treatment. It is simply a general statement of "findings" and, as such, is too thin a reed to support the rights and obligations read into it by the court below. The closest one can come in giving § 6010 meaning is that it justifies and supports Congress' appropriation of money under the Act and guides the Secretary in his review of state applications for federal funds.

*Pennhurst,* 451 U.S. at 19.

Section 15009(3)(B)(i) of the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. §§ 15001, *et. seq.*, has language that is almost identical to that in the Developmentally Disabled Assistance and Bill of Rights Act of 1975 that was analyzed in *Pennhurst*.

Section 15009(3)(B)(i) states:

Congress makes the following findings respecting the rights of individuals with developmental disabilities: . . . (3) The Federal Government and the States both have an obligation to ensure that public funds are provided only to institutional programs . . . that . . . (B) meet minimum standards relating to- (i) provision of care that is free of abuse, neglect . . . .

42 U.S.C. § 15009(3)(B)(i). Like the section analyzed in *Pennhurst,* § 15009(3)(B)(i) is phrased as "findings" of Congress. Because the Supreme Court has found this same language in a substantially similar Act to represent congressional preference, *Pennhurst*, 451 U.S. at 19, § 15009(3)(B)(i) cannot be construed as unambiguously creating a private right enforceable under 42 U.S.C. § 1983.

**b. 42 U.S.C. § 9501(1)(G)**

Similar analysis is applicable to § 9501(1)(G), another statute alleged by Plaintiff to create individual federal rights enforceable under § 1983.

Section 9501(1)(G) states:

It is the sense of the Congress that each State should review and revise, if necessary, its laws . . .  and in making such review and revision should take into account  . . . the following: (1) A person admitted to a program or facility for the purpose of receiving mental health services should be accorded the following: . . . The right to a humane treatment environment that affords reasonable protection from harm and appropriate privacy to such person with regard to personal needs.

42 U.S.C. § 9501(1)(G). This language communicates congressional preference.  As observed by the First Circuit Court of Appeals in *Monahan v. Dorchester Counseling Center, Inc.*, 961 F.2d 987, 994-95 (1st Cir. 1992), "use of the terms 'should' and 'the sense of Congress' indicate that the statute is merely precatory." Precatory statements in statutes cannot be the source of individual federal rights enforceable under § 1983.  *Gonzaga,* 536 U.S. at 282.

### c.  42 U.S.C. § 10841

The final statute Plaintiff claims creates an individual federal right is 42 U.S.C. § 10841.[2]  Congress has clearly stated its intent with respect to this statute.

Section 10851(a) states: "Titles I and II [42 U.S.C.A. §§ 10801 et seq., 10841] shall not be construed as establishing any new rights for individuals with mental illness."  When Congress clearly states that a statute does not create any new rights, the statute cannot serve as a source of individual federal rights enforceable under 42 U.S.C. § 1983.

Plaintiff's argument that the courts are split on whether these statutes confer private rights and its reliance on a pre-*Gonzaga* decision, *Nicoletti v. Brown*, 740 F.Supp. 1268

---

[2]This Section restates the provisions of 42 U.S.C. § 9501.  *See Monahan*, 961 F.2d at 994.

(N.D. Ohio, 1987), are misplaced.  The holding in *Nicoletti* is foreclosed by *Gonzaga*.[3]  In *Gonzaga*, the Supreme Court emphasized, "We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983."  536 U.S. at 283.

In light of the above, Plaintiff cannot assert a § 1983 claim based on the three federal statutes she relies upon.  Accordingly, Defendant's Rule 12(b)(6) motion is granted as to these § 1983 claims.  This, however, does not end the Court's discussion.  Plaintiff also asserts that she can state a § 1983 claim based upon Defendant's alleged violation of her substantive due process rights as guaranteed by the Fourteenth Amendment of the United States Constitution.  Defendant disagrees.  The Court now addresses this issue.

### 2.  Substantive Due Process Claim

Although Plaintiff titles Count I of her Complaint as a deprivation of substantive due process rights, she does not specifically allege a Constitutional violation in support of her

---

[3]In *Nicoletti*, the court held that Congress's use of mandatory language in 42 U.S.C. § 6042, that a "State must have in effect a system to protect and advocate the rights of persons with developmental disabilities," imposed a mandatory requirement on any state receiving funds under the Act.  740 F.Supp. at 1274.  The court also held "that the receipt of funds under the Disabled Assistance Act is conditioned upon the state creating individual habilitation plans."  *Id.* at 1275.  Putting the legislative intent to benefit the developmentally disabled together with the mandatory requirements on a state receiving funds under the Act, the district court held that the Act created federal rights to a habilitation plan.  *Id.* at 1274-75.  However, after *Gonzaga*, it is clear that a statute that imposes a mandatory requirement on a state without a clear intention to confer a federal right does not confer a federal right, even if there is legislative intent to benefit a class.  *Gonzaga*, 536 U.S. at 282-83.

§ 1983 claim.[4]  Plaintiff did, however, clarify in her response to Defendant's motion and at the hearing on that motion, that she would like to amend her Complaint to assert a Fourteenth Amendment violation of Washam's "liberty interest," and relies on *Youngberg v. Romeo*, 457 U.S. 307, 342 (1982), as support for her claim that the involuntarily committed have a constitutionally-protected liberty interest in having the State provide them with reasonably safe living conditions.  (Pl.'s Resp. at 8.)  Plaintiff asserts that Rose Mary Washam was totally dependent upon Defendant AVCMHS for her safety and care.  She contends that, while under Defendant's care, one of its staff leaders, Judy Muller, violated Rose Mary Washam's constitutionally-protected substantive due process rights when she failed to keep her "reasonably safe" during her morning shower, resulting in severe burns over more than half of her body from which she later died.

It is not disputed that Rose Mary Washam was involuntarily committed.[5]  Moreover, in light of Plaintiff's current assertions that she is pursuing a § 1983 claims against Defendant AVCMHS and Judith Muller, in her official capacity as staff leader for Defendant AVCMHS, for violating Ms. Washam's constitutionally-protected substantive due process rights by failing to keep Ms. Washam safe from burns during her shower, this Court cannot say that it is  "beyond doubt that the plaintiff can prove no set of facts in support of [her]

---

[4]Plaintiff alleges: "This treatment . . . served to deprive Plaintiff of her substantive due process rights guaranteed by federal statutes."  (Compl. at ¶ 31.)

[5]Plaintiff alleges, "Plaintiff's decedent . . . was a . . . client of AVCMHS, having an intake date of January 22, 1987; she came to AVCMHS from an institutional setting and resided in another AVCMHS group home before arriving at River Bend in the early 1990's." (Compl. ¶ 12.)

claim." *Conley*, 355 U.S. at 45-46.   Accordingly, Defendant's Rule 12(b)(6) motion to dismiss is denied.

In *Youngberg v. Romeo*, the Supreme Court held that the involuntarily committed,[6] enjoy "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests."   457 U.S. at 324.

> [T]he right to personal security constitutes a "historic liberty interest" protected <u>substantively by the Due Process Clause</u>. And that right is not extinguished by lawful confinement, even for penal purposes. If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed -- who may not be punished at all -- in unsafe conditions.

*Id.* at 315-16 (citations omitted, emphasis added).   This case concerns Rose Mary Washam's liberty interest in having the State provide her with reasonable safety while committed to the State's care.

In *Youngberg*, the State conceded "a duty to provide adequate food, shelter, clothing, and medical care" for the involuntarily committed.   *Id.* at 324.   The Court agreed that "[t]hese are the essentials of the care that the State must provide."   *Id.*   It then went on to observe that the "State also has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution."   *Id.*   Plaintiff asserts that the same holds true here with regard to the conditions of Rose Mary Washam's commitment in Defendant's facility.

---

[6] The plaintiff in *Youngberg* was profoundly mentally retarded and was committed to a state hospital by his mother.  457 U.S. at 309-10.

As to "the proper standard for determining whether the State adequately has protected the rights of the involuntarily committed mentally retarded," the *Youngberg* Court adopted a standard that it felt reflected "the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints"; i.e., one that "requires that the courts make certain that professional judgment in fact was exercised." *Id.* at 321. When "determining whether the State has met its obligations in these respects, decisions made by the appropriate professional are entitled to a presumption of correctness." *Id.* The Court explained its reasoning:

> Such a presumption is necessary to enable institutions of this type--often, unfortunately, overcrowded and understaffed--to function. A single professional may have to make decisions with respect to a number of residents with widely varying needs and problems in the course of a normal day. The administrators, and particularly professional personnel, should not be required to make each decision in the shadow of an action for damages.

*Id.* at 324-25. "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 322.

The Supreme Court later emphasized that the State's constitutional duty owed to the involuntarily committed arises "when the State takes a person into its custody and holds him there against his will." *Deshaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf - through incarceration, institutionalization, or other similar restraint of personal liberty - which is the 'deprivation of

15

liberty' triggering the protections of the Due Process Clause . . . ." *Id.* at 200. *See also County of Sacramento v. Lewis*, 523 U.S. 848, 852 n.12 (1998) (observing that "[t]he combination of a patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare" and further observing that "a severely retarded person could state a claim under § 1983 for a violation of substantive due process if the personnel at the mental institution where he was confined failed to exercise professional judgment . . . ."). The State's affirmative duty to provide a reasonably safe environment for the involuntarily committed, just like the other *DeShaney* exception for state-created dangers, "does not depend upon a finding of a custom or policy." *Doe v. Claiborne County*, 103 F.3d 495, 509 (6th Cir. 1996).

The Sixth Circuit Court of Appeals recently examined a *Youngberg* claim. In *Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834, 847-50 (6th Cir. 2002), a § 1983 action was brought by the estate of an involuntarily committed patient who died while at Northville Regional Psychiatric Hospital, a State-run mental health hospital. Applying *Youngberg*, the *Terrance* Court observed that this claim must be analyzed in light of "the decedent's heightened constitutional protection under *Youngberg*." *Id.* at 848. It further observed that, under *Youngberg*, "the appropriate question for the jury was not simply whether the decedent's liberty interest was infringed . . . . Rather, the lower court should have charged the jury to determine whether the lack of absolute safety violated the decedent's substantive due process rights." *Terrance*, 286 F.3d at 849 (citing *Youngberg*, 457 U.S. at 320).

16

The *Terrance* Court first balanced the "respective due process interests of the decedent" and Northville Regional Psychiatric Hospital ("NRPH") and concluded that the Fourteenth Amendment protects the interests of the involuntarily committed to reasonable conditions of safety.  *Id.* at 849.

> While NRPH has an interest in running an administratively efficient institution, such an interest should not be allowed to trump the constitutional rights of the involuntarily committed who are institutionalized for their own safety.  Although the State has considerable discretion in determining the nature and scope of its responsibilities, it is also charged with adhering to professional norms of conduct. [citation omitted]  Moreover, where hospital staff admittedly fail to follow institutional policies and procedures, questions about the State's adherence to accepted professional conduct are not unwarranted.

*Id.* at 849-50.

The Sixth Circuit then observed that, although "[t]he decedent's personal safety was entrusted to NRPH and its staff", "the decedent met his demise while committed to NRPH." *Id.* at 850.  It further observed that "numerous questions about the decedent's safety and NRPH's staff's actions abound."  *Id.*  Because those factual issues were not explored and "because the district court failed to consider th[e] case under the Fourteenth Amendment standard" set out in *Youngberg*, the Sixth Circuit remanded the case.  It instructed the district court to consider "the defendants' duty to provide reasonable safety for the decedent under a heightened Fourteenth Amendment standard."  *Id.* at 850.

As discussed above, Plaintiff is to file an Amended Complaint against Defendant AVCMHS and Judith Miller, in her official capacity, **on or before June 12, 2006**, asserting a § 1983 claim based on the alleged violation of Rose Mary Washam's Fourteenth Amendment substantive due process rights as recognized in *Youngberg v. Romeo*, 457

17

U.S. 307 (1982), and *Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834, 848 (6th Cir. 2002).

### C.  Rule 56(c) Motion for Summary Judgment

Defendant argues that, even if it acknowledges that Plaintiff can state a § 1983 claim based on a *Youngberg* violation of Rose Mary Washam's substantive due process rights, it is entitled to summary judgment on this § 1983 claim because Plaintiff cannot show that AVCMHS is responsible for the alleged constitutional violation.  Because Plaintiff is to amend her complaint to allege a *Youngberg* claim, Defendant's motion for summary judgment is premature and is thus denied without prejudice.

## IV.  Conclusion

For the above-stated reasons, Defendant's motion to dismiss  is GRANTED IN PART and DENIED IN PART.  It is granted as to Plaintiff's § 1983 claims based on federal statutes but denied as to Plaintiff's § 1983 claims based on an alleged deprivation of Rose Mary Washam's substantive due process rights as guaranteed by the Fourteen Amendment and recognized by the United States Supreme Court in *Youngberg*.

Plaintiff is to amend her Complaint on or before June 12, 2006, so as to assert a § 1983 claim against Defendant AVCMHS and AVCMHS staff leader Judith Miller, in her official capacity, based on a *Youngberg* Fourteenth Amendment violation of Rose Mary Washam's substantive due process rights.

Defendant's motion seeking summary judgment is DENIED WITHOUT PREJUDICE.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  May 16, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on May 16, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

19